IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 12-cv-01594-MSK-MEH

JASON GALLEGOS, and
JENNIFER YARBROUGH, for themselves and on behalf of Cyrus Gallegos,

       Plaintiffs,

v.

CITY OF FORT LUPTON,
FORT LUPTON POLICE DEPARTMENT,
SERGEANT KEVIN HALLORAN,
DETECTIVE CRYSTAL SCHWARTZ,
OFFICER PAUL STIPE,
MARK PAYLER, Superintendent of Schools,
JOHN HOAG, Assistant Superintendent of Schools,
NATIVITY MILLER, Butler Elementary School Principal,
STEPHANIE ANDERSON, Butler Elementary Assistant Principal,
MARK GONZALEZ, Expelled Student Services Coordinator,
THE ENTIRE WELD COUNTY RE-8 BOARD OF EDUCATION, as individuals, namely
CRIS HOWARD, Board of Education President,
BETH MCWILLIAMS, Board of Education Vice President,
DARLINE LONG, Board of Education Secretary,
JANELLE PEREZ, Board of Education Treasurer,
CAROL MCDERMOTT, Board of Education Director,
SUZANN MCCRUMB, Board of Education Director,
DAWN KOSHIO GILLESPIE, Board of Education Director, and
WELD 8 SCHOOL DISTRICT,

       Defendants.

_____

## RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE
_____

**Michael E. Hegarty, United States Magistrate Judge**.

      Before the Court are the School District Defendants' Rule 12(b)(6) Motion to Dismiss [filed

July 27, 2012; docket #16] and the Ft. Lupton ("Police") Defendants' Motion to Dismiss Plaintiff's

Second Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(6) [filed July 30, 2012; docket #17].

Pursuant to 28 U.S.C. § 636(b)(1)(B) and D.C. Colo. LCivR 72.1C, these matters are referred to this Court for recommendation [dockets #21 and #22].  The motions are fully briefed, and oral argument would not materially assist the Court in its adjudication of the motions.  For the following reasons, the Court RECOMMENDS that Defendants' Motions to Dismiss be **granted in part and denied in part** as set forth herein.[1]

## BACKGROUND

Plaintiffs initiated this action on April 20, 2012, in Weld County District Court.  (Docket #1-1.)  In that action, Plaintiffs were granted leave to amend their complaint.  (Docket #1-9.)  On June 19, 2012, Defendants removed the action to this Court pursuant to 28 U.S.C. § 1446.  (Docket #1.)  Thereafter, Plaintiffs filed the operative Second Amended Complaint pursuant to 42 U.S.C. § 1983 alleging violations of the Fourth and Fifth Amendments to the United States Constitution, and to state law alleging emotional distress and invasion of privacy. (Docket #15.)

## I.     Facts

The following are factual allegations (as opposed to legal conclusions, bare assertions or merely conclusory allegations) made by the Plaintiffs in the Second Amended Complaint, which are

---

[1]Be advised that all parties shall have fourteen (14) days after service hereof to serve and file any written objections in order to obtain reconsideration by the District Judge to whom this case is assigned. Fed. R. Civ. P. 72(b).  The party filing objections must specifically identify those findings or recommendations to which the objections are being made.  The District Court need not consider frivolous, conclusive or general objections.  A party's failure to file such written objections to proposed findings and recommendations contained in this report may bar the party from a de novo determination by the District Judge of the proposed findings and recommendations.  *United States v. Raddatz*, 447 U.S. 667, 676-83 (1980); 28 U.S.C. § 636(b)(1).  Additionally, the failure to file written objections to the proposed findings and recommendations within fourteen (14) days after being served with a copy may bar the aggrieved party from appealing the factual findings of the Magistrate Judge that are accepted or adopted by the District Court.  *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Moore v. United States*, 950 F.2d 656, 659 (10th Cir. 1991).

taken as true for analysis under Fed. R. Civ. P. 12(b)(6) pursuant to *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court must limit its review to the four corners of the complaint, but may also consider documents attached to the complaint as exhibits, *Oxendine v. Kaplan,* 241 F.3d 1272, 1275 (10th Cir. 2001), as well as unattached documents which are referred to in the complaint and central to the plaintiff's claim, so long as the authenticity of such documents is undisputed. *Jacobsen v. Deseret Book Co.,* 287 F.3d 936, 941 (10th Cir. 2002); *Dean Witter Reynolds, Inc. v. Howsam,* 261 F.3d 956, 961 (10th Cir. 2001).

In April 2011, Cyrus Gallegos was a ten-year-old student at Butler Elementary School in Ft. Lupton, Colorado in the Weld 8 School District. On or about the morning of April 21, 2011, Cyrus overheard someone in the hallway of his school say, "There's a gun." He looked toward where the remark was made and saw several students looking into a backpack. Cyrus was standing in the hallway with two students, Sergio Lujan and Elijah Martinez, and said to them, "Don't go over there, because there's a gun." He and the two students went down the hall to the music classroom, and Cyrus reported what he had heard to the music teacher, Ms. Turner.

Cyrus and the two boys, Sergio and Elijah, then went to the playground for recess. At recess, Cyrus noticed that Elijah was pulled off the playground by an adult. Sometime later, the school was locked down, and soon thereafter, Cyrus was pulled out of his classroom by the principal, Nativity Miller. Ms. Miller and the assistant principal, Stephanie Anderson, questioned Cyrus in the hallway with Elijah Martinez present. Miller and Anderson then took Cyrus to benches outside the principal's office, and both asked Cyrus what had happened.

Cyrus told them that he had heard a student, he thought a boy, say, "There's a gun," that he saw a group of students looking with surprise into a backpack, and that he reported this to his music

teacher.  Miller and Anderson left, and Cyrus thought they were going to question Ms. Turner and

Sergio Lujan, the other student who was with Cyrus when he made the report to Ms. Turner. Cyrus

did not see Ms. Turner, but the principal and vice principal returned with Sergio and questioned all

three boys.

Miller and Anderson took Elijah and Sergio to a room while Cyrus waited in the hallway.

The police arrived at the school and brought all three boys together with the principal and vice

principal.  Detective Crystal Schwartz said they had heard there was a gun and asked if the boys

knew who had it.  Detective Schwartz later asked Cyrus if he knew where the gun was.  Somewhat

later, she asked Cyrus to show her which backpack he had seen and he complied.

Later, Detective Schwartz and another officer (believed to be Officer Paul Stipe) took Cyrus

down the hall, patted him down, and told him to sit on the floor of the hallway.  Detective Schwartz

and another officer (believed to be Officer Stipe) then said, "Tell us one more time what happened."

Cyrus said that he and his classmates were in the hallway and he heard that there was a gun and he

saw a backpack, so he went to Ms. Turner and told her.  The two officers walked down the hallway.

Detective Schwartz and Ms. Miller conferred, and Schwartz came back and said to Cyrus, "Are you

lying?" He said he was not lying.

By this point, Cyrus was frightened and confused.  He had been trained to trust the police
and
to report any potential crimes or problems to the authorities in a Junior Advocates Program, where

he had worked with the police department and won a jacket.  He started to think that he was being

treated like a criminal instead of a good citizen.

After more questioning, police officers took Cyrus to a hallway by the gym, led him outside,

and put him in a marked patrol car, where he was confined.  He was confused, upset, and alarmed by the confinement.  Principal Miller later told Cyrus' mother, Plaintiff Jennifer Yarbrough, that the police said they had arrested Cyrus and transported him to the police station.

While Cyrus was sitting in the back seat of the patrol car at the school, he asked police officers several times to please call his parents. He had also asked the officers while he was inside the school to telephone his parents.  The officers did not respond, and Cyrus was not permitted to telephone his parents.

While Cyrus was sitting in the back seat of the patrol car at the school, an officer Cyrus had not seen before crouched down outside the back seat with the door open and said, "Hey, Cyrus, we know you're lying. Just tell the truth."  This officer also told Cyrus that he was going to be in trouble. Cyrus was terrified by being detained and further terrified by these threats.

In the meantime, Ms. Yarbrough had found out through the grapevine that the school had been locked down. She went to the school, where she was told that all parents could go inside and talk to their children and take them home if they chose to.  She had joined the line of parents waiting to go inside when Principal Miller took her from the line, saying, "We need you in the office now. Your son was involved in this incident."  Many other parents overheard this statement.

The principal and an unidentified man started to escort Ms. Yarbrough to the office, but she asked, "Where is my son?" Only then did they tell her that a fourth grader had brought a gun to school, that Cyrus

was at the police station, and that she needed to get there fast.

When Cyrus arrived at the police station, the officer who had told Cyrus he was going to be in trouble came to the patrol car, escorted Cyrus to an interrogation room, and said, "Stay here."

5

Cyrus was frightened and alarmed by this officer and at being left alone in this room. He was not, and had not been, advised of his constitutional rights. Detective Schwartz entered the room, took Cyrus's basic information, and asked, "What happened?" Cyrus told her what he had reported to Ms. Turner, the music teacher.   Detective Schwartz asked, "Did you learn anything from what happened?"  He did not answer, so she asked again and then left.  Detective Schwartz later entered the room again and said, "We know you're lying."  She left again.  All of the questioning and accusations increased Cyrus' alarm, fear, and confusion.

Detective Schwartz met Ms. Yarbrough when she came to the station and told her there had been a report of a gun at school.  Cyrus' father, Jason Gallegos, met them there shortly afterward. Ms. Yarbrough told Schwartz that Mr. Gallegos owned firearms and Cyrus had been to a firing range and respected firearms.  Detective Schwartz told Ms. Yarbrough, "We believe Cyrus is lying. What do you do to get Cyrus to tell the truth?" Ms. Yarbrough said, "If Cyrus heard there was a gun, I believe he'd tell someone." She added that if Cyrus were lying, the best way to get him to tell the truth was to scare him by saying he would go to jail and he would admit the truth. At no time during this conversation were Ms. Yarbrough and Mr. Jason Gallegos informed of any rights that might belong to them or to Cyrus.

Detective Schwartz asked Ms. Yarbrough, "If Cyrus lied, why would he lie?" Ms. Yarbrough mentioned that Cyrus had had a fight the night before with his mother and brother, and Mr. Gallegos added that if Cyrus did not tell the truth he would likely be joking or messing around.  Detective Schwartz then allowed Mr. Gallegos to enter the interrogation room to speak with Cyrus alone, although their conversation was being recorded. Cyrus told his father what had happened, that he had overheard someone say, "There's a gun." He was getting his words mixed up at this point and

6

repeatedly said, "I misheard," instead of "I overheard," but he recounted to his father what had happened in the hallway and said he had been patted down.  His father reassured him that he had done nothing wrong and that he was right to report the gun.

Both Detective Schwartz and Sergeant Kevin Halloran then questioned Cyrus with both his parents present.  However, neither the parents nor Cyrus were advised of their constitutional rights. When Mr. Gallegos reiterated that Cyrus had done nothing wrong, Halloran interrupted and said, "This guy (Cyrus) broke down and told me he was lying."

Some time later during this interview, Detective Schwartz advised Cyrus of his *Miranda* rights, which he waived.

Detective Schwartz stated to the parents that their son had falsified a report, and several times during the formal interrogation she said to Cyrus, "No, Cyrus, you're lying."  After considerable questioning, Mr. Gallegos indicated that he did not want his son interrogated any further, and Cyrus was released.

When Cyrus attempted to return to school the next day, Friday, April 22, 2011, he and his parents were informed that he was expelled until the school conducted a hearing.  Ms. Yarbrough also received a telephone call that day informing her of an expulsion hearing set for April 26, 2011. The telephone call was the only notice Cyrus and his parents received before the actual hearing on April 26, 2011.  Cyrus was expelled before a hearing was conducted.

In addition, Cyrus' brother, Drake, was confronted by a middle school student on April 22, 2011, who had heard that Cyrus was arrested for taking a gun to school. When Ms. Yarbrough questioned the Butler Elementary principal at the school board expulsion hearing on April 26, 2011,

about why her middle school son had been confronted, assistant principal Anderson said there had

been a mix-up and she thought the music teacher, Ms. Turner, had said Cyrus had a gun at school.

Ms. Yarbrough corrected Anderson's false impression at that hearing.

At the April 26, 2011 detention hearing, Assistant Superintendent Hoag asked, "Did you

even question Ms. Turner?" When he discovered that the school administration had not talked to

Turner, he adjourned the hearing, telling Cyrus' parents to go home and that the school

administration would talk to Ms. Turner.   The day after the expulsion hearing, on April 27, 2011,

Ms. Yarbrough received a telephone call asking for the parents and Cyrus to meet with the principal

and assistant principal at Butler Elementary. At the meeting at the school, Principal Miller told the

Gallegos family that there would be no further hearing, Cyrus would not be expelled and could go

to class that morning, and said, "We learned a lot on how we should handle this type of event. There

was a big misunderstanding."

Cyrus was admitted to school on April 27, having been suspended from school on April 21,

22, 25, 26, and 27, 2011 (April 21 and 27 were partial days).  A few days later, Sergeant Halloran

signaled to Ms. Yarbrough in public near the school and apologized to her saying that there would

be no charges against Cyrus, that the police had made an investigation, and that what Cyrus said was

true.

Plaintiffs seek noneconomic and punitive damages against the Defendants, as well as

attorney's fees and costs associated with the action.

## II.   Procedural History

In response to Plaintiffs' Second Amended Complaint, the Defendants, characterized herein

as the "Police (Ft. Lupton) Defendants" and as the "School (District) Defendants," filed the present

Motions to Dismiss pursuant to Fed. R. Civ. P. 12(b)(6).  All individual Defendants contend they are entitled to qualified immunity for Plaintiffs' failure to demonstrate that clearly established law would have given the Defendants notice that their detention and questioning of Cyrus was unlawful. Further, the School Defendants identify thirteen potential claims asserted against them and argue each one fails to state a claim for relief.  The Police Defendants identify seven potential claims asserted against them and argue each one fails to state a claim for relief.  The Plaintiffs respond in a single brief by addressing and rebutting each of Defendants' arguments as to each claim.  *See* docket #23.  The Defendants filed reply briefs rebutting each argument made by the Plaintiffs.  The Court will follow the parties' lead, and analyze each potential claim pursuant to Fed. R. Civ. P. 12(b)(6).

## LEGAL STANDARDS

### I.      Dismissal under Fed. R. Civ. P. 12(b)(6)

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Plausibility, in the context of a motion to dismiss, means that the plaintiff pled facts which allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.  Twombly* requires a two-prong analysis.  First, a court must identify "the allegations in the complaint that are not entitled to the assumption of truth," that is, those allegations which are legal conclusions, bare assertions, or merely conclusory.  *Id.* at 678-80.  Second, the Court must consider the factual allegations "to determine if they plausibly suggest an entitlement to relief."  *Id.* at 681.  If the allegations state a plausible claim for relief, such claim survives the motion to dismiss.  *Id.* at 680.

Plausibility refers "to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs 'have not nudged their claims across the line from conceivable to plausible.'" *Khalik v. United Air Lines*, 671 F.3d 1188, 1191 (10th Cir. 2012) (quoting *Robbins v. Oklahoma,* 519 F.3d 1242, 1247 (10th Cir. 2008)). "The nature and specificity of the allegations required to state a plausible claim will vary based on context." *Kansas Penn Gaming, LLC v. Collins,* 656 F.3d 1210, 1215 (10th Cir. 2011). Thus, while the Rule 12(b)(6) standard does not require that a plaintiff establish a prima facie case in a complaint, the elements of each alleged cause of action may help to determine whether the plaintiff has set forth a plausible claim. *Khalik*, 671 F.3d at 1191.

## II.      Treatment of a Pro Se Plaintiff's Complaint

A federal court must construe a *pro se* plaintiff's "pleadings liberally, applying a less stringent standard than is applicable to pleadings filed by lawyers. [The] court, however, will not supply additional factual allegations to round out a plaintiff's complaint or construct a legal theory on plaintiff's behalf." *Whitney v. New Mexico*, 113 F.3d 1170, 1173-74 (10th Cir. 1997) (quotations and citations omitted). The Tenth Circuit interpreted this rule to mean, "if the court can reasonably read the pleadings to state a valid claim on which the plaintiff could prevail, it should do so despite the plaintiff's failure to cite proper legal authority, his confusion of various legal theories, his poor syntax and sentence construction, or his unfamiliarity with pleading requirements." *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991). However, this interpretation is qualified in that it is not "the proper function of the district court to assume the role of advocate for the pro se litigant." *Id.*; *see also Peterson v. Shanks*, 149 F.3d 1140, 1143 (10th Cir. 1998) (citing *Dunn v. White*, 880 F.2d 1188, 1197 (10th Cir. 1989)).

## ANALYSIS

The Second Amended Complaint asserts constitutional claims against both the individual and municipal Defendants, as well as state law claims against the Defendants. The Court will first analyze Plaintiffs' constitutional claims against the individual Defendants to determine whether these Defendants are entitled to qualified immunity. The Court will next analyze Plaintiffs' claims against the municipal Defendants, then address the state law claims, if applicable.

## I.     Qualified Immunity for Individual Defendants

Defendants assert that they are entitled to qualified immunity on the claims against them in their individual capacities.[2] Qualified immunity protects from litigation a public official whose possible violation of a plaintiff's civil rights was not clearly a violation at the time of the official's actions. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "It is an entitlement not to stand trial or face the other burdens of litigation." *Ahmad v. Furlong*, 435 F.3d 1196, 1198 (10th Cir. 2006) (internal quotations and citations omitted). "The privilege is an immunity from suit rather than a mere defense to liability." *Id.*

Qualified immunity is designed to shield public officials and ensure "that erroneous suits do not even go to trial." *Hinton v. City of Elwood, Kan.*, 997 F.2d 774, 779 (10th Cir. 1993) (citing *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985); *Harlow*, 457 U.S. at 806-08 (1982); *Pueblo Neighborhood Health Ctrs. v. Losavio*, 847 F.2d 642, 645 (10th Cir. 1988)). Consequently, courts should address the qualified immunity defense at the earliest possible stage in litigation. *Albright*

---

[2]The School Defendants assert qualified immunity in both their individual and official capacities. However, the qualified immunity defense is available only to government officials sued in their individual capacities. *Buchwald v. University of New Mexico Sch. of Med.*, 159 F.3d 487, 492 (10th Cir. 1998).

11

*v. Rodriguez*, 51 F.3d 1531, 1534 (10th Cir. 1995); *Medina v. Cram*, 252 F.3d 1124, 1127-28 (10th Cir. 2001).

When a defendant asserts the defense of qualified immunity, the burden shifts to the plaintiff to overcome the asserted immunity. *Riggins v. Goodman*, 572 F.3d 1101, 1107 (10th Cir. 2009). "The plaintiff must demonstrate on the facts alleged both that the defendant violated his constitutional or statutory rights, and that the right was clearly established at the time of the alleged unlawful activity." *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).

The Supreme Court has discarded a review process that required courts to examine these questions sequentially, first considering whether a right had been violated, and then second – if the court concluded a right had been violated – whether that right was clearly established at the time of the alleged violation. *Pearson*, 555 U.S. at 238-42. *Pearson* retired this process, instead affording courts the discretion to decide "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* at 236; *see also Christensen v. Park City Mun. Corp.*, 554 F.3d 1271, 1277 (10th Cir. 2009).

Here, for Plaintiffs' claims pursuant to 42 U.S.C. § 1983, the Court examines first whether Plaintiffs have demonstrated on the alleged facts that the individual Defendants violated their constitutional rights. If the Court finds that a right was violated, the Court will then proceed to analyze whether Plaintiffs' constitutional right was clearly established at the time of the alleged conduct.

A.     Personal Participation of Individual School Board Members

Plaintiffs assert violations of the Fifth Amendment against the individual members of Weld County RE-8 Board of Education. The School Defendants argue Plaintiffs have failed to allege the

12

members' personal participation in the alleged violations, as necessary under 42 U.S.C. § 1983.

To recover under § 1983, a plaintiff must establish the violation of a right secured by the Constitution and laws of the United States. *Dodds v. Richardson*, 614 F.3d 1185, 1193 (10th Cir. 2010) (internal quotations omitted) (quoting *West v. Atkins*, 487 U.S. 42, 48 (1988)). "Individual liability under § 1983 must be based on personal involvement in the alleged constitutional violation." *Foote v. Spiegel*, 118 F.3d 1416, 1423 (10th Cir. 1997). Thus, there must be an affirmative link between actions taken by a defendant and any plan or policy put into effect that violates a plaintiff's constitutional rights. *Dodds*, 614 F.3d at 1200-01. "Personal involvement does not require direct participation because § 1983 states any official who causes a citizen to be deprived of her constitutional rights can also be held liable." *Id.* at 1195 (quoting *Buck v. Albuquerque*, 549 F.3d 1269, 1279 (10th Cir. 2008)) (internal quotations omitted).

The Defendant board members are correct that Plaintiffs do not name them individually in the "General Allegations" or "Claims for Relief" sections of the Second Amended Complaint. However, the Plaintiffs refer to "school officials," "school district" or "school board" in paragraphs 52-58, and 62.[3] These paragraphs assert Fifth Amendment claims based upon the factual allegations in paragraphs 40-42 concerning Cyrus' alleged suspension and the subsequent hearing on expulsion held allegedly on the authority of the school board. Plaintiffs allege the expulsion hearing "appears to be a policy or custom promulgated by the Weld 8 School Board." Second Amended Complaint, ¶ 62, docket #15 at 8. Plaintiffs explain that they received a letter at the hearing on school board letterhead indicating that the hearing was held on the authority of the school board. Docket #23 at

---

[3]The Court notes that the Second Amended Complaint does not include a paragraph "57," but simply jumps from 56 to 58. *See* docket #15 at 7.

2.

       Without determining whether Plaintiffs' facts plausibly assert a "Fifth Amendment" violation, this Court concludes that Plaintiffs' characterizations of Defendants as "school officials," "school board" and "school district" are sufficient to put the individual school board members on notice of the claims against them (*see Iqbal*, 556 U.S. at 680), and the Plaintiffs plausibly allege the individual Defendants' participation in authorizing a hearing on Cyrus' expulsion from Butler Elementary School.  However, as set forth below, the Court recommends dismissal of the due process claims concerning the expulsion hearing for the Plaintiffs' failure to plausibly state such claims.  Therefore, although the Plaintiffs properly allege the individual school board members' participation in the challenged conduct, the conduct itself does not rise to the level of a due process claim and the Court recommends that the District Court **grant** the School Defendants' motion to dismiss the individual school board members, Defendants Howard, McWilliams, Long, Perez, McDermott, McCrumb, and Gillespie, from this action.

       B.     <u>Fourth Amendment Claims Re: Seizure Against Individual School Officials</u>

       Plaintiffs allege School District Superintendent Mark Payler, Principal Nativity Miller, and Assistant Principal Stephanie Anderson "willfully and wantonly" detained, held and questioned Cyrus without his parents present, without allowing him to contact his parents, without a knowing waiver of his rights, and without being advised of his rights and any charges against him, allegedly in violation of his Fourth and Fifth Amendment rights.  Second Amended Complaint, ¶¶ 46-49, 51, docket #15.  Defendants challenge Plaintiffs' Fourth Amendment claims in this regard arguing that Plaintiffs fail to allege sufficient facts to conclude the "seizure" was not supported by reasonable suspicion, and fail to allege sufficient facts to conclude the "seizure" was excessively intrusive in

light of the seriousness of the suspected offense and surrounding circumstances.

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. "Because the Amendment focuses on safeguarding persons from unwarranted intrusion, and not on regulating the behavior of particular governmental actors, the prohibition against unreasonable seizures extends to civil, as well as criminal, investigations by the government. *Jones v. Hunt*, 410 F.3d 1221, 1225 (10th Cir. 2005) (citing *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1206 (10th Cir. 2003) ("The focus of the Amendment is thus on the security of the person, not the identity of the searcher or the purpose of the search.")).

A seizure occurs for Fourth Amendment purposes when "a reasonable person would have believed that he was not free to leave." *Michigan v. Chesternut,* 486 U.S. 567, 573 (1988). Here, the School Defendants appear to concede (for purposes of the present motion) that a seizure took place. They argue, however, that Plaintiffs fail to allege facts demonstrating the seizure was unreasonable.

In *New Jersey v. T.L.O.*, 469 U.S. 325 (1985), the Supreme Court held that where school officials detain and question a child for the purpose of maintaining or restoring order in the school:

> the accommodation of the privacy interests of schoolchildren with the substantial need of teachers and administrators for freedom to maintain order in the schools does not require strict adherence to the requirement that searches be based on probable cause to believe that the subject of the search has violated or is violating the law. Rather, the legality of a search of a student should depend simply on the reasonableness, under all the circumstances, of the search.

*T.L.O.*, 469 U.S. at 341. Adopting the *Terry* standard, the Supreme Court explained that a search of a student by a school official is reasonable if "justified at its inception" and "reasonably related in scope to the circumstances which justified the interference in the first place." *Id.* at 341-42

(quoting *Terry v. Ohio*, 392 U.S. 1, 20 (1968)). The Supreme Court fashioned a relaxed standard due to its concern about "unduly burden[ing] the efforts of school authorities to maintain order in their schools." *Jones*, 410 F.3d at 1228 (citing *T.L.O.*, 469 U.S. at 342). However, the relaxed standard applies only when school officials and/or the police endeavor to maintain school order or security. *Id.*; *see also Pacheco v. Hopmeier*, 770 F. Supp. 2d 1174, 1183 (D.N.M. 2011).

Here, the allegations reveal that Cyrus was seized by both school officials and the police for the purpose of questioning him about the presence of a gun in the school. The Court finds that the *Terry* standard applies to this Fourth Amendment analysis.

"[T]he same considerations which moved the Supreme Court to apply a relaxed Fourth Amendment standard in cases involving school searches support applying the same standard in school seizure cases." *Edwards v. Rees*, 883 F.2d 882, 884 (10th Cir. 1989) (applying *Terry* standard where a junior high school vice principal seized a high school student to question him about a bomb threat). Thus, the seizure (detention and questioning) of a student by a school official or police officer endeavoring to maintain school order or security is reasonable[4] if it is both initially justified and reasonably related in scope to the circumstances that justified the initial seizure. *See Pacheco*, 770 F. Supp. 2d at 1183.

"[A] search is initially justified if the school official has reasonable suspicion that the student violated the law or a school rule." *Id.* at 1184 n. 1 (citing *T.L.O.*, 469 U.S. at 341-42); *see also Wofford v. Evans*, 390 F.3d 318, 326 (4th Cir. 2004) ("a school official may detain a student if there is a reasonable basis for believing that the pupil has violated the law or a school rule"). Defendants

---

[4]Reasonableness in this context is a question of law. *Couture v. Bd. of Educ. of Albuquerque Public Schs.*, 535 F.3d 1243, 1251 (10th Cir. 2008).

argue that Plaintiffs' allegations in paragraphs 7 and 8 of the Second Amended Complaint constitute

a reasonable suspicion to detain and question Cyrus as to whether he possessed a gun on school

grounds.  Motion, docket #16 at 5.  The Court disagrees.  Paragraphs 7 and 8 of the complaint state

in full:

> On or about the morning of April 21, 2011, Cyrus overheard someone in the hallway
> of his school, Butler Elementary, say, "There's a gun." He looked towards where the
> remark had come from and saw several students looking into a backpack. Cyrus was
> standing in the hallway with two students, Sergio Lujan and Elijah Martinez, and
> said to them, "Don't go over there, because there's a gun." He and the two students
> went down the hall to the music classroom, and Cyrus reported what he had heard
> to the music teacher, Ms. Turner.

Second Amended Complaint, ¶¶ 7-8, docket #15.  Taking these allegations as true, Defendants

certainly would be on notice that Cyrus had knowledge about a gun on school property; however,

nothing in these allegations suggests that Cyrus had possession of a gun on school property.  In fact,

no other allegations in the Second Amended Complaint reflect the possibility that Cyrus, himself,

possessed a gun on school property.  Defendants argue no other basis upon which they might have

reasonable suspicion to detain Cyrus.  Thus, the Court must conclude, based upon these allegations,

that Plaintiffs have alleged sufficient facts demonstrating that the seizure was not supported by a

reasonable suspicion that Cyrus broke a law or a school rule.  Rather, if these allegations are true,

it would appear that Cyrus attempted to *comply* with any rule or policy encouraging students to

report perceived infractions.  Accordingly, the Court recommends finding that Plaintiffs' allegations

plausibly allege an unjustified seizure in violation of the Fourth Amendment.

Furthermore, the Court finds Plaintiffs allege sufficient facts to demonstrate the seizure was

unreasonable in its scope.  A seizure is "permissible in its scope when the measures adopted are

reasonably related to the objectives of the [seizure] and not excessive[ ] ... in light of the age and sex

of the student and the nature of the infraction." *Couture*, 535 F.3d at 1253 (quoting *T.L.O.*, 469 U.S. at 342). The School Defendants argue that one hour and fifteen minutes of detention at the school is reasonable under the circumstances. They cite the Tenth Circuit's opinion in *Edwards, supra*, for its conclusion that a 20-minute detention to question a student about a bomb threat *that he made* was reasonable. Here, the allegations reflect that Cyrus neither was in possession of a gun nor was accused of having a gun. Thus, a 75-minute detention simply to question a ten-year-old boy about a three-word statement he heard in the hallway and reported to his music teacher, taken as true, is unreasonable under the circumstances.

Defendants contend that Plaintiffs cite to no clearly established law concerning their Fourth Amendment claim. Reply, docket #34 at 3-4. The Court disagrees. Certainly, school officials in the Tenth Circuit have been on notice that any seizure of a student to maintain the school order or security must be initially justified and reasonably related in scope to the circumstances that justified the initial seizure since as early as 1989. *See Edwards*, 883 F.2d at 884; *see also Couture*, 535 F. at 1251. As such, the Court recommends finding that Plaintiffs' allegations plausibly allege an unreasonable seizure in violation of the Fourth Amendment for which the individual School Defendants are not entitled to qualified immunity, and **denying** the School Defendants' motion to dismiss the Fourth Amendment claims against them.

C.     Fourth Amendment Claims Re: Seizure Against Individual Police Officers

Plaintiffs allege the Police Defendants Detective Schwartz, Sergeant Halloran and Officer Stipe "willfully and wantonly" detained Cyrus, transported him to the police station and questioned Cyrus without his parents present, without allowing him to contact his parents, without a knowing waiver of his rights, and without being advised of his rights and any charges against him, allegedly

in violation of his Fourth and Fifth Amendment rights.  Second Amended Complaint, ¶¶ 46-49, 51, docket #15.

Typically, "police officers who seize and transport a person against his or her will to a police station for questioning must have probable cause." *Pacheco*, 770 F. Supp. 2d at 1183.  However, as set forth above, the *Terry* reasonableness standard applies to analyze the Police Defendants' conduct here, since the allegations reflect that the challenged conduct by the Defendant police officers involved efforts to maintain school order or security. *See id.* (citing *Jones*, 410 F.3d at 1228) (reasonableness standard does not apply where a joint police officer-school administrator seizure is <u>not</u> for the purpose of maintaining order on school property).

Here, the Police Defendants assume for purposes of their motion that their detention and questioning of Cyrus was a seizure.  Motion, docket #17 at 4.  They argue, however, that the seizure was reasonable under the Fourth Amendment. *Id.*

The seizure (detention and questioning) of a student by a police officer endeavoring to maintain school order or security is reasonable if it is both initially justified and reasonably related in scope to the circumstances that justified the initial seizure. *See Pacheco*, 770 F. Supp. 2d at 1183. The Police Defendants contend that "the initial questioning of Cyrus was justified at its inception based on Cyrus' report that a gun was at school."  Motion, docket #17 at 6.  Defendants cite *Wofford*, 390 F.3d at 327 for support of their position that Cyrus' seizure was reasonable.  However, *Wofford* involved the 15- to 90-minute detention and questioning of a student *accused* of bringing a gun to school. *Id.* Citing *T.L.O.*, 469 U.S. at 341-42, the *Wofford* court found the student's seizure justified at its inception because "a school official may detain a student if there is a reasonable basis for believing that the pupil has violated the law or a school rule." *Id.* at 326.

19

Just as with the School Defendants and taking the allegations as true, the Court finds the facts do not demonstrate the Police Defendants' detention and questioning of Cyrus on school property and at the police station was justified at its inception.  Furthermore, the facts taken as true do not demonstrate that the police officers' seizure of Cyrus was reasonable in its scope.  In accordance with *Couture*, 535 F.3d at 1253, the seizure must be reasonably related in scope to the circumstances that justified the seizure, and must not be excessive particularly considering the age and sex of the student and the nature of the infraction.

While, of course, a gun on school property is a serious matter justifying investigation by school officials and, perhaps, police officers, the 75-minute detention and questioning on school property of a ten-year-old boy who was *not* accused of possessing a gun, the transportation of the boy to the police station in a police car, and the further questioning of the boy at the station, all without his parents present, is both excessive and unreasonable in scope.  As set forth above concerning the school officials, Cyrus' right against an unreasonable seizure was clearly established at the time it occurred. Accordingly, this Court recommends finding that Plaintiffs' allegations plausibly allege an unreasonable seizure in violation of the Fourth Amendment for which the individual Police Defendants are not entitled to qualified immunity, and **denying** the Police Defendants' motion to dismiss the Fourth Amendment claims against them.

D.    Due Process Claims re: Suspension against Individual School Officials

Plaintiffs allege that "school officials" willfully suspended Cyrus from school, failed to notify Plaintiffs in writing before the suspension, failed to inform Plaintiffs of the charges against Cyrus or specific rules Cyrus was accused of breaking, and failed to hold a hearing before suspending Cyrus, all in violation of their rights to due process under the "Fifth Amendment."  The

School Defendants counter in sections 4, 6 and 8 of their motion that Plaintiffs fail to identify the "school officials," fail to allege sufficient facts demonstrating that the Colorado law setting forth the procedure for suspension is unconstitutional, and fail to rebut the law's lack of a requirement that notice be in writing. Plaintiffs reply that "school officials" refers to any named Defendant responsible for giving notice and an opportunity to be heard, including Principal Miller, Vice Principal Anderson, Superintendent Payler, Assistant Superintendent Hoag, Expelled Student Services Coordinator Gonzalez and/or the individual school board members. Further, Plaintiffs contend Defendants' conduct here violated their due process rights pursuant to the opinions in *Goss v. Lopez*, 419 U.S. 565 (1967) and *Edwards*, *supra*.

First, the Court notes that Plaintiffs' due process claims are properly raised pursuant to the _Fourteenth_ Amendment of the United States Constitution, not the Fifth Amendment. *See United States v. Balsys*, 524 U.S. 666, 700 (1998) (Stevens, J., concurring) ("Th[e] [Fifth Amendment] constrains the power of the Federal Government to deprive any person 'of life, liberty or property, without due process of law,' just as the Fourteenth Amendment imposes comparable constraints on the power of the States."); *see also Ward v. Anderson*, 494 F.3d 929, 932 n.3 (10th Cir. 2007) ("only the Fourteenth Amendment imposes a due process requirement on state officials").

Second, the Court agrees with Plaintiffs that characterizing the named Defendants as "school officials" is sufficient to put the Defendants on notice of the claims against them in accordance with Fed. R. Civ. P. 8. *Iqbal*, 556 U.S. at 681. The Plaintiffs need not state their due process claims with particularity, as required by Fed. R. Civ P. 9(b), naming exactly who did what to whom. *See United States ex rel. Sikkenga v. Regence Bluecross Blueshield of Utah*, 472 F.3d 702, 726-27 (10th Cir. 2006). The Court can plausibly infer from the Plaintiffs' allegations that the principal, assistant

21

principal, superintendent, assistant superintendent and/or the expelled student coordinator might be involved in the decision to suspend Cyrus following his report of a gun at school; however, there is no indication in the allegations that the individual school board members would be involved in such decision.

Third, the Court finds that Plaintiffs state plausible procedural due process claims that Defendants failed to inform Plaintiffs of the charge and failed to provide Plaintiffs an informal hearing, but Plaintiffs do not state a plausible claim that Defendants failed to notify Plaintiffs of the suspension in writing.  The Fourteenth Amendment forbids a State from depriving an individual of life, liberty or property without due process of law.  *Couture*, 535 F.3d at 1256.  "A person alleging that he has been deprived of his right to procedural due process must prove two elements: that he possessed a constitutionally protected liberty or property interest such that the due process protections were applicable, and that he was not afforded an appropriate level of process."  *Id.* (quoting *Zwygart v. Bd. of Cnty. Comm'rs of Jefferson Cnty.*, 483 F.3d 1086, 1093 (10th Cir. 2007) (internal quotations omitted).  Public school students have a protected property interest in public education and, therefore, are entitled to certain procedural due process protections within the educational context. *Id.* at 1257 (citing *Goss*, 419 U.S. at 574).

Defendants argue that "there is no constitutional requirement that the School District [ ] establish a 'proper foundation' prior to suspending a student," and that the Colorado statute providing the procedure for suspension has been found to meet constitutional muster.  However, while Defendants may be correct about establishing a "proper foundation," the Plaintiffs allege the proper elements necessary to state a procedural due process claim.  Further, the Plaintiffs do not challenge the constitutionality of the applicable Colorado statute.

The facts underlying Plaintiffs' due process claims concerning the suspension are stated as follows:

> When Cyrus attempted to return to school the next day, Friday, April 22, 2011, he and his parents were informed that he was expelled[5] until the school conducted a hearing; he was [suspended] ... from school for more than three days.  Ms. Yarbrough also received a telephone call that day informing her of an expulsion hearing set for April 26, 2011. The telephone call was the only notice Cyrus and his parents received before the actual hearing on 4/26/11. ... Cyrus was expelled before a hearing was conducted and the telephone notice of the hearing did not give Ms. Yarbrough information about ... the reasons for expulsion.

Second Amended Complaint, ¶ 40, docket #15. Both the Colorado statute and the Fourteenth Amendment require notification of the grounds for suspension.  *See Goss*, 419 U.S. at 581 ("due process requires, in connection with a suspension of 10 days or less, that the student be given oral or written notice of the charges against him"); *see also* School Attendance Law of 1963, as amended, Colo. Rev. Stat. § 22-33-105(3)(a) ("[i]f a pupil is suspended ..., the suspending authority shall immediately notify the parent, guardian, or legal custodian of the pupil that the pupil has been suspended and of the grounds for the suspension").[6]  Further, both the Colorado statute and the Fourteenth Amendment require some sort of hearing before a student is suspended.  *Goss*, 419 U.S. at 581 ("due process requires, in connection with a suspension of 10 days or less, that ... if [the student] denies [the charges], [the student be given] an explanation of the evidence the authorities

---

[5]Here, the Plaintiffs use the words and derivatives of the words, "suspension" and "expulsion," interchangeably between the factual allegations and the claims for relief.  For the purpose of clarity and because it will not affect the Fourteenth Amendment analysis, the Court will infer from the allegations that Cyrus' removal from school on April 22, 2011 was a "suspension" pending the April 26, 2011 expulsion hearing.

[6]The fact that Defendants cite this statute in support of their position leads the Court to conclude that Cyrus' suspension was purportedly governed by and executed in accordance with Colo. Rev. Stat. § 22-35-105(3).

have and an opportunity to present his side of the story"); *see also* Colo. Rev. Stat. § 22-33-105(3)(c) ("[a] pupil suspended for a period of ten days or less shall receive an informal hearing by the school principal or the principal's designee prior to the pupil's removal from school, unless an emergency requires immediate removal from school, in which case an informal hearing shall follow as soon after the pupil's removal as practicable.").

The Plaintiffs' allegations reveal no emergency situation on April 22, 2011, the day after Cyrus' detention and questioning. Thus, the allegations that Defendants failed to inform Plaintiffs of the "charges" or the law(s) or rule(s) Cyrus was accused of breaking at the time Defendants suspended Cyrus, and failed to give Cyrus an informal hearing prior to his removal from school, taken as true, state plausible claims for violation of procedural due process under the Fourteenth Amendment. However, in accordance with *Goss*, *supra*, Defendants need not inform Plaintiffs of the suspension or charges in writing; therefore, Plaintiffs fail to state a due process claim in this regard.

Further, Plaintiffs' due process rights in this regard are clearly established pursuant to *Goss*, *Edwards*, and *Couture*.

Accordingly, the Court recommends that the District **deny** Defendants' motion to dismiss Plaintiffs' due process claim concerning the allegations that Defendants failed to inform Plaintiffs of the underlying charge(s) for the suspension and failed to provide him an informal hearing before removal from school, but find the individual Defendants entitled to qualified immunity and **grant** Defendants' motion to dismiss the due process claim concerning Plaintiffs' allegation that Defendants' notification was not in writing.

     E.     <u>Due Process Claims re: Expulsion Hearing against Individual School Officials</u>

24

Plaintiffs allege that "school officials" failed to find or weigh evidence against Cyrus before bringing an expulsion charge, failed to inform Plaintiffs of the charges for expulsion and/or the rules he was accused of violating, allowed the expulsion hearing to go forward despite a police officer's comment that "the incident appeared to be a joke," failed to notify Plaintiffs of their right to bring counsel to the expulsion hearing, failed to inform Plaintiffs of their rights to bring witnesses and evidence to the hearing, and failed to provide a record of the expulsion hearing, all in violation of their rights to due process under the Fifth [Fourteenth] Amendment.  The School Defendants counter in sections 5, 7 and 9 of their motion that Plaintiffs fail to identify the "school officials," fail to allege sufficient facts demonstrating that the Colorado law setting forth the procedure for expulsion is unconstitutional, and fail to rebut the law's lack of a requirement that the notice advise parents of a right to bring counsel or a right to bring witnesses and evidence, and that the district provide a record of the hearing.

The facts underlying Plaintiffs' due process claims concerning the expulsion hearing are stated as follows:

Ms. Yarbrough also received a telephone call [on April 22, 2011] informing her of an expulsion hearing set for April 26, 2011. The telephone call was the only notice Cyrus and his parents received before the actual hearing on April 26, 2011.

At the 4/26/11 detention hearing, Assistant Superintendent Hoag asked, "Did you even question Ms. Turner?" When he discovered that the school administration had not talked to Turner, he adjourned the hearing, telling Cyrus' parents to go home and that the school administration would talk to Ms. Turner.

The day after the expulsion hearing, on April 27, 2011, Ms. Yarbrough received a telephone call asking for the parents and Cyrus to meet with the principal and assistant principal at Butler Elementary. At the meeting at the school, Principal Miller told the Gallegos family that there would be no further hearing, Cyrus would not be expelled and could go to class that morning, and said, "We learned a lot on how we should handle this type of event. There was a big misunderstanding."

Second Amended Complaint, ¶¶ 41-43, docket #15.

The Tenth Circuit has found the three-factor test from the Supreme Court's decision in *Mathews v. Eldridge,* 424 U.S. 319 (1976), decided one year after *Goss*, is appropriate for determining when additional procedure for a long-term suspension or expulsion is due, because the test "crystallizes the balancing of student interests against school interests suggested in the *Goss* decision." *Watson ex rel. Watson v. Beckel*, 242 F.3d 1237, 1240 (10th Cir. 2001). Under *Mathews,* a court must balance three factors: (1) the private interest that will be affected by the official action, (2) the probable value, if any, of additional or substitute procedural safeguards, and (3) the government's interest, including the fiscal and administrative burden, that the additional or substitute procedural requirements would entail. *Id.* (citing *Mathews*, 424 U.S. at 334-35).

In *Watson*, the Tenth Circuit rejected the plaintiff's request for an order requiring that a student facing expulsion or a long-term suspension "be afforded written notice specifying the charges, legal counsel, the presentation of evidence, the right to cross-examine witnesses, an impartial board, a transcript of the hearing, and independent review of the decision," concluding that "due process does not require all of these rights." *Watson*, 242 F.3d at 1242-43 (citing *Gorman v. Univ. of R.I.,* 837 F.2d 7, 16 (1st Cir. 1988) (rejecting the argument that due process requires the right to counsel, to cross-examine witnesses, or to have a transcript of the hearing) and *Newsome v. Batavia Local Sch. Dist.,* 842 F.2d 920, 924 (6th Cir. 1988) (holding that due process does not require the right to cross-examine witnesses or that investigating officials be excluded from the deliberation process)). Therefore, because the Plaintiffs do not possess constitutional guarantees to have counsel at the expulsion hearing, bring evidence or witnesses to the hearing or have a transcript of the hearing, the Defendants have not violated any due process rights as to these

26

allegations. *See Coronado v. Valleyview Pub. Sch. Dist.*, 537 F.3d 791, 795 (7th Cir. 2008) ("Due process does not, however, require a judicial or quasi-judicial trial – with all of the features and safeguards of a delinquency proceeding – before a school may punish misconduct."). Plaintiffs' citation to the Individuals with Disabilities in Education Act ("IDEA") does not change the Court's conclusion; there are no allegations that Cyrus is a student protected by the IDEA.

As to Plaintiffs' allegations that Defendants failed to "find or weigh evidence" against Cyrus before bringing an expulsion charge and that the superintendent allowed the expulsion hearing to go forward after hearing from police that "the incident appeared to be a joke," these allegations do not challenge procedure and, therefore, cannot support a due process claim. That is, Plaintiffs appear to be challenging the outcome of the hearing, rather than the procedure itself. *See Smith v. Barber*, 316 F. Supp. 2d 992, 1032 (D. Kan. 2004) (rejecting due process claim that school officials suspended plaintiffs based upon an "erroneous belief" that plaintiffs were "guilty"). Even if the Plaintiffs were properly challenging Defendants' procedure, the Plaintiffs provide no legal support for their contention that due process requires the Defendants "find and weigh evidence" before holding an expulsion hearing.

Finally, as to Plaintiffs' claim that Defendants failed to inform them of the charge(s) against Cyrus before the expulsion hearing, the Plaintiffs have failed to allege substantial prejudice from the allegedly inadequate procedure. *See Watson*, 242 F.3d at 1242. That is, taking Plaintiffs' allegations as true, even though they may not have been able to prepare to defend Cyrus at the expulsion hearing, the Plaintiffs suffered no prejudice as a result of having no notice of the charges because the hearing was cut short by the hearing officer upon learning that school officials had failed to question the music teacher. The hearing was then concluded and the charge(s) dropped against

27

Cyrus.  There was never a need for the Plaintiffs to defend the charges and, thus, the Plaintiffs suffered no substantial prejudice from the inadequate procedure.  Accordingly, the Plaintiffs have not plausibly stated a procedural due process claim against the Defendants for the allegedly inadequate notice of expulsion charges.

Therefore, as the Plaintiffs have failed to plausibly allege claims for procedural due process concerning the expulsion hearing, the Court respectfully recommends that the District Court find the individual Defendants entitled to qualified immunity and **grant** the School Defendants' motion to dismiss these claims.

F.      Fifth Amendment Claims Against Individual Police Officers

Plaintiffs concede that their Fifth Amendment claims alleging the police officers questioned Cyrus without advising him of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966) are not actionable.  *See Chavez v. Martinez*, 538 U.S. 760, 773 (2003) ("[police officer's] failure to read *Miranda* warnings to [plaintiff] did not violate [plaintiff's] constitutional rights and cannot be grounds for a § 1983 action.").  Further, without actually tailoring an argument, the Plaintiffs ask that their claims be read in light of the Fourteenth Amendment's right to due process in accordance with *Chavez*.

The Supreme Court in *Chavez* recognized that deprivations of liberty caused by "the most egregious official conduct" – that which is "so brutal and so offensive to human dignity" as to "shock the conscious" – may violate the Due Process Clause.  *Id.* at 774.  Here, even assuming that the police officers' questioning of Cyrus somehow deprived him of a liberty interest, the allegations do not demonstrate the officers' conduct was either "egregious" or "conscious shocking," within the meaning ascribed by the Supreme Court.  *See id.* (rejecting the due process claim of a suspect

28

questioned by the police just after being shot several times by an officer while he was transported to the hospital and during medical treatment at the hospital).

Therefore, because the Plaintiffs have failed to plausibly state Fifth Amendment "self incrimination" or Fourteenth Amendment due process claims against the individual officers, the Court recommends that the District Court find the individual police officers are entitled to qualified immunity and **grant** the Police Defendants' Motion to Dismiss Plaintiffs' Fifth Amendment "self incrimination" and Fourteenth Amendment due process claims.

G.    Constitutional Privacy Claims Against Individual School Officials

Plaintiffs allege the School Defendants violated their privacy rights by opening the expulsion hearing to the public and by stating to Cyrus' mother in the presence of other parents that her son was involved in the "gun incident" at the school.

"While the Constitution does not explicitly establish a right of privacy, the Supreme Court has recognized for nearly 100 years that a right of personal privacy does exist." *Aid for Women v. Foulston*, 441 F.3d 1101, 1116 (10th Cir. 2006) (quoting *Eastwood v. Dep't of Corr. of Okla.*, 846 F.2d 627, 630 (10th Cir. 1988)).  "This right protects two kinds of privacy interests: the individual's interest in avoiding disclosure of personal matters and the interest in being independent when making certain kinds of personal decisions." *Id.* (internal quotation marks omitted); *see also Whalen v. Roe*, 429 U.S. 589, 599-600 (1977) ("The cases sometimes characterized as protecting 'privacy' have in fact involved at least two different kinds of interests. One is the individual interest in avoiding disclosure of personal matters, and another is the interest in independence in making certain kinds of important decisions.") (footnotes omitted).  "The first interest, which is often termed 'informational privacy,' protects the individual from governmental inquiry into matters in which it

29

does not have a legitimate and proper interest." *Aid for Women*, 441 F.3d at 1116 (internal quotation marks and citation omitted); *see also Nilson v. Layton City*, 45 F.3d 369, 371 (10th Cir. 1995) (the Due Process Clause of the Fourteenth Amendment safeguards the privacy of an individual's personal information from government disclosure).   "An individual is thus protected from disclosure of information where the individual 'has a legitimate expectation ... that it will remain confidential.'" *Aid for Women*, 441 F.3d at 1116 (quoting *Sheets v. Salt Lake Cnty.*, 45 F.3d 1383, 1387 (10th Cir. 1995)).

Minors possess a right to informational privacy. *Id.*   Typically, determining whether the right to informational privacy has been violated requires an analysis of three questions: (1) whether the individual has a legitimate expectation of confidentiality, (2) whether disclosure of the confidential information advanced a compelling state interest, and (3) whether the disclosure was accomplished in the least intrusive manner. *Id.* at 1119; *see also Nilson*, 45 F.3d at 371.   However, if the individual is a minor, the second question is modified to whether disclosure of the confidential information serves any significant state interest that is not present in the case of an adult. *Aid for Women*, 441 F.3d at 1119.

With respect to the first question, "[e]xpectations of privacy are legitimate if the information which the state possesses is highly personal or intimate." *Nilson*, 45 F.3d at 372.   For example, "confidential medical information is entitled to constitutional privacy protection." *A.L.A. v. West Valley City*, 26 F.3d 989, 990 (10th Cir. 1994).   However, "[i]nformation readily available to the public is not protected by the constitutional right to privacy. Consequently, government disclosures of arrest records, judicial proceedings and information contained in police reports do not implicate the right to privacy." *Nilson*, 45 F.3d at 372 (citations omitted).   Moreover, the Tenth Circuit has

30

determined that a teacher's disclosure of information, observations and impressions of a grade school student, including the student's work and test grades, does not rise to the level of a "constitutionally-protected category" of private information. *Cudjoe v. Indep. Sch. Dist. No. 12*, 297 F.3d 1058, 1063 (10th Cir. 2002). "It is irrelevant to a constitutional privacy analysis whether the publicly disclosed allegations are true or false; the disclosed information itself must warrant constitutional protection." *Gallo Loecks ex rel. T.L. v. Reynolds*, 34 F. App'x 644, 648 (10th Cir. 2002) (citations, quotation marks and brackets omitted).

"The legitimacy of an individual's expectations depends, at least in part, upon the intimate or otherwise personal nature of the material which the state possesses." *Mangels v. Pena*, 789 F.2d 836, 839 (10th Cir. 1986). Here, Plaintiffs allege Defendant Miller violated their rights to privacy by stating loudly to Plaintiff Yarbrough in the presence of other parents, "your son was involved in this [gun] incident." The Court finds such information falls outside of the protection of the Due Process Clause. First, taking the allegations as true, the information does not rise to the level of "intimate" or "personal" about Cyrus himself; his involvement in the investigation of whether there was a gun on school property reveals nothing highly personal or confidential about Cyrus.[7] Second, the information was not necessarily confidential; Cyrus warned two boys about the possible presence of a gun and reported what he heard to Ms. Turner. Thus, Cyrus himself caused others to know of

---

[7]Plaintiffs' citation to *U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749 (1989) does not change the Court's conclusion. In *Reporters Comm.*, the Supreme Court held that disclosure of the contents of an FBI rap sheet to third parties could reasonably be expected to constitute unwarranted invasion of personal privacy with the meaning of the Freedom of Information Act (FOIA). *Id.* at 780. *Reporters Comm.* is distinguishable for the following reasons: (1) Cyrus was not charged with any crime and, thus, any disclosure by the school officials or police officers did not involve criminal charges or convictions, and (2) unlike here, the Supreme Court analyzed the privacy interest at issue pursuant to the FOIA.

his involvement in the incident. Third, Cyrus' involvement was certainly reported by the police, who came to investigate Cyrus' report. Police reports are generally public record. *See Nilson*, 45 F.3d at 372.

Likewise, Plaintiffs' allegation that Defendants failed to protect Cyrus' constitutional privacy rights by opening his expulsion hearing to the public states no constitutional privacy claim. Plaintiffs fail to allege that they had any expectation of privacy in the hearing; there are no allegations that Cyrus' parents asked that the hearing be held confidentially or that school policy or procedure provide for the hearing to be held in private. As such, the Court concludes Plaintiffs fail to allege legitimate expectations that either Cyrus' involvement in the gun incident or that information disclosed in Cyrus' expulsion hearing would be kept private.

Although unclear, Plaintiffs appear to allege that any violation of the tort of "invasion of privacy" suffices to establish a constitutional violation. However, the Supreme Court has made clear that officials "do not lose their qualified immunity merely because their conduct violates some statutory or administrative provision." *Couture*, 535 F.3d at 1255 (citing *Davis v. Scherer,* 468 U.S. 183, 194 (1984)); *see also Tanberg v. Sholtis,* 401 F.3d 1151, 1159-60 (10th Cir. 2005); *Smith v. Freland,* 954 F.2d 343, 347 (6th Cir. 1992) ("The issue is whether [the officer] violated the Constitution, not whether he should be disciplined by the local police force.").

Accordingly, the Court respectfully recommends the District Court find the individual School Defendants entitled to qualified immunity and **grant** the School Defendants' motion to dismiss Plaintiffs' privacy claims under the Due Process Clause of the Fourteenth Amendment.

### H.    Constitutional Privacy Claims Against Individual Police Officers

Plaintiffs allege the Police Defendants violated their privacy rights by moving Cyrus to a

police car in view of students and parents, and by signaling to Cyrus' mother, Plaintiff Yarbrough, near the school.

As set forth above, the Court finds Plaintiffs' allegations fall outside of the protection of the Due Process Clause. First, taking the allegations as true, moving Cyrus to the police car reveals nothing "intimate" or "personal" about Cyrus himself; likewise, the sergeant's signal to Ms. Yarbrough communicates nothing intimate or personal about her or Cyrus. That is, Cyrus' involvement in the investigation of whether there was a gun on school property reveals nothing highly personal or confidential about Cyrus or his parents. Therefore, the Court respectfully recommends the District Court find the individual Police Defendants entitled to qualified immunity and **grant** the Police Defendants' motion to dismiss Plaintiffs' privacy claims under the Due Process Clause of the Fourteenth Amendment.

## II.    *Monell* Claims Against Municipal Defendants

Plaintiff alleges the expulsion hearing and the police interrogation without a *Miranda* warning or parents present are policies or customs officially adopted and promulgated by the School District and Ft. Lupton Police Department, respectively.

In *Monell v. New York City Department of Social Services,* 436 U.S. 658 (1978), the Supreme Court held that "a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.* at 694. A policy is a policy statement, ordinance, regulation, or decision officially adopted and promulgated by the entities' officers. *Id.* at 690. A custom is a "persistent and widespread ...

practice[ ] of ... officials." *Id.* at 691 (quoting *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 167-68 (1970)).

However, a municipality cannot be liable under § 1983 without a predicate constitutional harm inflicted by an officer. *Jiron v. City of Lakewood,* 392 F.3d 410, 419 (10th Cir. 2004) (citing *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986)); *see also Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1317-18 (10th Cir. 2002) ("We will not hold a municipality liable [for constitutional violations] when there was no underlying constitutional violation by any of its officers").

Here, the Court has concluded that the School Defendants' alleged conduct with regard to the expulsion hearing does not rise to the level of a constitutional violation. Further, the Court finds Plaintiffs have no Fifth Amendment "self incrimination" claims against the Police Defendants. Therefore, without a predicate constitutional harm, neither the school district nor the City of Ft. Lupton may be held liable under *Monell* for these allegations, and the Court respectfully recommends that the District Court **grant** the motions to dismiss Plaintiffs' *Monell* claims concerning the expulsion hearing and the *Miranda* warning.

However, Plaintiffs also allege that the police's questioning of Cyrus without his parents present is "a policy or custom promulgated by the Ft. Lupton Police Department."[8] *See* Amended Complaint, ¶ 63, docket #15. This Court has found that Plaintiffs' allegations, taken as true, demonstrate an unreasonable seizure of Cyrus by the police officers.

A municipality is responsible under § 1983 only when the execution of a government policy

---

[8]The Police Defendants also argue that the Ft. Lupton Police Department is an improper party in this action, citing *Stump v. Gates*, 777 F. Supp. 808, 815 (D. Colo. 1991) (finding the defendant police department and coroner's office were not "persons" against whom § 1983 claims may be asserted). This Court agrees, and recommends that the Ft. Lupton Police Department be dismissed as a Defendant for this alternate reason.

or custom actually causes an injury of constitutional dimensions.  *Monell,* 436 U.S. at 694; *see also*

*D.T. v. Indep. Sch. Dist.,* 894 F.2d 1176, 1187 (10th Cir. 1990) (plaintiff must prove direct nexus

between constitutional tort and municipality's authorization or approval thereof, either expressly or

otherwise, by the adoption of any plan or policy).  "Proof of a single incident of unconstitutional

activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof

that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed

to a municipal policymaker." *Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985).

Here, the allegations reflect only a single incident of the police detaining and questioning

Cyrus without his parents present.  Plaintiffs allege no other incidents in which the Ft. Lupton police

have detained and questioned minors without the presence of their parents; therefore, there is no

indication that the seizure was caused by an *existing* unconstitutional policy.

Further, "to impose liability on a municipality for the alleged unconstitutional injury of its

employees, a plaintiff must allege facts sufficient to show the existence of a municipal 'policy' or

'custom' that caused the constitutional injury." *Deray v. City of Colo. Springs*, No. 11-cv-02639-

MSK, 2012 WL 1901220, at *3 (D. Colo. May 25, 2012) (citing *Dodds,* 614 F.3d at 1201-02).  The

plaintiff must allege facts that would, if true, show that the city acted with the requisite state of mind

in the promulgation of that policy or custom.  *Id.*

> Under well-established principles governing municipal liability, "deliberate
> indifference" is the appropriate standard when a plaintiff asserts that the alleged
> custom or policy comprised a failure to act. *Jenkins v. Wood,* 81 F.3d 988, 994 (10th
> Cir. 1996) (citation omitted).  This means that the need for more or different action
> was "so obvious, and the inadequacy so likely to result in the violation of [the
> plaintiff's due process] rights, that the policymakers of the [governmental entity] can
> reasonably be said to have been deliberately indifferent to the need" for additional
> action." *Porro v. Barnes,* 624 F.3d 1322, 1328 (10th Cir. 2010) (quoting *Jenkins,* 81
> F.3d at 994); *see also Barney,* 143 F.3d at 1307 (deliberate indifference may be
> demonstrated "when the municipality has actual or constructive notice that its action

> or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm."). A plaintiff does not carry his or her burden by showing "general deficiencies" but rather must "identify a specific deficiency that was obvious and closely related to his [or her] injury ... so that it might fairly be said that the official policy or custom was both deliberately indifferent to his constitutional rights and the moving force behind his injury." *Porro,* 624 F.3d at 1328 (citations and internal punctuation omitted).

*Deray*, 2012 WL 1901220 at *3. Here, the Plaintiffs' allegations fail to demonstrate deliberate indifference by the police; there are no allegations that the officers questioned Cyrus knowing that they should have had his parents present first, but disregarded that fact. Moreover, the allegations do not demonstrate the police deliberately questioned Cyrus without his parents present for an improper purpose (i.e., to improperly coerce information) or knowing that Cyrus himself may reveal certain information without his parents in the room.

As such, and because the Plaintiffs identify only a single incident of unconstitutional conduct, the Court finds the Plaintiffs' allegations do not establish the violation of a municipal policy or custom as described by the Supreme Court in *Monell*. This Court respectfully recommends that the District Court **grant** the School Defendants' and Police Defendants' motions to dismiss Plaintiffs' claims against the municipalities brought pursuant to *Monell, supra*.

III.   **State Law Claims**

The Plaintiffs allege this Court "has jurisdiction because the events upon which the claims are asserted occurred in the state of Colorado, and because all parties to this case reside in the state of Colorado." Second Amended Complaint, ¶ 4, docket #15. More properly, however, this Court has original subject-matter jurisdiction over the constitutional claims pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 1983, and may exercise supplemental jurisdiction over state law claims "that are so related to claims in the action within such original jurisdiction that they form part of the same

case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a).  Here, this Court recommends that certain Fourth and Fourteenth Amendment claims survive the present motions to dismiss; if the recommendation is adopted, the Court will have original jurisdiction over certain of Plaintiffs' claims.   As such, the Court recommends that the District Court exercise supplemental jurisdiction over Plaintiffs' closely related state law claims, as set forth below.   28 U.S.C. § 1367(c)(3).

> A.      Intentional Infliction of Emotional Distress

While the Plaintiffs did not use the words "extreme" or "outrageous," Plaintiffs allege they have suffered emotional distress as a result of the School Defendants' alleged "willful and wanton" conduct in detaining, questioning, suspending and attempting to expel Cyrus, and as a result of the Police Defendants' conduct in detaining and questioning Cyrus without his parents present, calling Cyrus a liar, and taking Cyrus to the police station without probable cause.   In addition, Plaintiffs allege they have suffered emotional distress as a result of increased scrutiny and contact by the police, including the detention of Plaintiff Jason Gallegos in early 2012.

To establish a claim for outrageous conduct (otherwise known as "intentional infliction of emotional distress") under Colorado law, a plaintiff must show that: "(1) the defendant engaged in extreme and outrageous conduct; (2) the defendant engaged in such conduct recklessly or with the intent of causing the plaintiff severe emotional distress; and (3) the defendant's conduct caused plaintiff to suffer severe emotional distress." *McCarty v. Kaiser-Hill Co.*, 15 P.3d 1122, 1126 (Colo. App. 2000).   "Although the question whether conduct is outrageous is generally one of fact to be determined by a jury, it is the initial responsibility of a court to determine whether reasonable persons could differ on the question."  *Id.*  "The level of outrageousness required for conduct to

create liability for intentional infliction of emotional distress is extremely high." *Id.* "Liability has been found only where the conduct has been so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *McCarty,* 15 P.3d at 1126; *see also Coors Brewing Co. v. Floyd*, 978 P.2d 663, 666 (Colo. 1999) (en banc) (allegations "that Coors engaged in an extensive criminal conspiracy involving illegal drugs and money laundering and that Coors fired [Plaintiff] to scapegoat him for these crimes" was *not* outrageous as a matter of law); *Churchey v. Adolph Coors Co.*, 759 P.2d 1336, 1350 (Colo. 1988) (the acts must so arouse resentment in average members of the community as to lead them to exclaim, "Outrageous!"). "Proof of the tort of outrageous conduct must consist of either an extreme act, both in character and degree, or a pattern of conduct from which the ineluctable conclusion is the infliction of severe mental suffering was calculated or recklessly and callously inflicted." *Gard v. Teletronics Pacing Sys., Inc.*, 859 F. Supp. 1349, 1354 (D. Colo. 1994).

As set forth herein, the Court finds the Plaintiffs have plausibly alleged Fourth Amendment claims related to Cyrus' detention and questioning, and Fourteenth Amendment due process claims concerning Cyrus' suspension from school against the individual School Defendants.  Further, the Court finds the Plaintiffs have alleged plausible Fourth Amendment claims against the individual Police Defendants.  Taking the Plaintiffs' allegations as true, the Court concludes reasonable persons could differ as to whether the hours-long detention and questioning of a ten-year-old boy, who simply reported the presence of a gun in the school, without his parents present, both at school and at a police station, by adult school authorities and police officers, together with transportation of the child to the station in a police car without reasonable suspicion to do so, is "so outrageous in

character and so extreme in degree as to go beyond all possible bounds of decency." However, reasonable persons would not differ as to whether the School Defendants' conduct with respect to the expulsion hearing, which was cut short and the charges dropped against Cyrus, and whether the Police Defendants' conduct concerning Jason Gallegos (as stated in the Second Amended Complaint and analyzed below) were outrageous.

Therefore, the Court recommends that the District Court **grant** the School Defendants' and Police Defendants' motions to dismiss any emotional distress claims concerning the attempted expulsion of Cyrus and the detention of Jason Gallegos, but **deny** the motions to dismiss emotional distress claims concerning the detention, questioning, transportation to the police station and suspension of Cyrus by the Defendants.

B.    Invasion of Privacy

Plaintiffs allege that the Defendants engaged in two forms of invasion of privacy – "unreasonable publicity" and placing Plaintiffs in a "false light" – when Defendant Miller stated to Plaintiff Yarbrough in the presence of other parents, "your son was involved in this incident," when the police transported Cyrus in a police car in the presence of students and parents, when Defendant Sergeant Halloran openly signaled to Ms. Yarbrough near the school, and when police detained Plaintiff Gallegos for driving while intoxicated.

Colorado does not recognize a claim for "false light," which is described as "publicity that unreasonably places another in a false light before the public." *Denver Publ'g Co. v. Bueno*, 54 P.3d 893, 904 (Colo. 2002). Therefore, this Court recommends that the District Court **grant** Defendants' motions to dismiss any invasion of privacy claims alleged to place Plaintiffs in a false light.

Colorado does, however, recognize a claim for "unreasonable publicity given to one's private

life," otherwise characterized as "disclosure."  *See Robert C. Ozer, P.C. v. Borquez*, 940 P.2d 371, 377 (Colo. 1997).  To succeed on this claim, a plaintiff must plausibly allege (1) the fact or facts disclosed are private in nature; (2) the disclosure was made to the public; (3) the disclosure was one which would be highly offensive to a reasonable person; (4) the fact or facts disclosed were not of legitimate concern to the public; and (5) the defendant acted with reckless disregard of the private nature of the fact or facts disclosed.  *Id.*

The disclosure of facts that are already public will not support a claim for invasion of privacy.  *Id.*  Here, the Court has already found that Cyrus' involvement in the investigation as to whether there was a gun on school property was made public by Cyrus' warning to two other boys and report to Ms. Turner.  Therefore, the Principal Miller's statement to Ms. Yarbrough was not private in nature.

Public disclosure requires communication to the public in general or to a large number of persons.  *Id.*  The police officers' public transportation of Cyrus to the police station is not a "communication" to the public.  Even if it were, any disclosure of Cyrus being taken to the police station reveals nothing private in nature about Cyrus.  *See id.* ("facts related to an individual's sexual relations, or 'unpleasant or disgraceful' illnesses, are considered private in nature").

Sergeant Halloran's public signal to Ms. Yarbrough near the school simply communicates that the sergeant wished to speak with Ms. Yarbrough and likewise reveals nothing private in nature about Ms. Yarbrough or about Cyrus.  In fact, Sergeant Halloran simply apologized to Ms. Yarbrough and told her there would be no charges against Cyrus.  Certainly, no reasonable person would find Sergeant Halloran's signal or his communication to Ms. Yarbrough to be highly offensive.

40

Finally, Plaintiffs' allegations fail to mention any public disclosure or communication by the Police Defendants regarding the police detention of Jason Gallegos. Even if his arrest and detention were made in public, Plaintiffs fail to allege how such information is private in nature about Mr. Gallegos. Under Plaintiffs' theory, anyone ever stopped, detained, or arrested for driving while intoxicated would have a claim for invasion of privacy against the police. Surely, this Court will not affirm such theory or find a claim for invasion of privacy under such circumstances.

Accordingly, the Court respectfully recommends that the District Court **grant** Defendants' motions to dismiss Plaintiffs' state law invasion of privacy claims.

## IV.   Parents' Standing

The Second Amended Complaint is somewhat vague about which Plaintiff or Plaintiffs assert each claim. It appears to be undisputed that a parent may serve as a "next friend" for purposes of seeking recovery for the claims of a minor plaintiff. However, the Defendants challenge Cyrus' parents' standing to assert their own claims in this action. In their response brief, the Plaintiffs clarify that Plaintiff Jennifer Yarbrough seeks redress for invasion of her privacy by Sergeant Halloran and Principal Miller, and Plaintiff Jason Gallegos seeks recovery for alleged violations of his Fourth and "Fifth" Amendment rights concerning a 2012 detention and arrest on a charge of driving while intoxicated.

To have standing, a plaintiff must have "alleged such a personal stake in the outcome of the controversy as to warrant *his* invocation of federal court jurisdiction." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009) (internal quotations omitted) (emphasis in original). "The Supreme Court's standing jurisprudence contains two strands: Article III standing, which enforces the Constitution's case-or-controversy requirement, and prudential standing, which embodies judicially

self-imposed limits on the exercise of federal jurisdiction." *The Wilderness Society v. Kane Cnty.*, 632 F.3d 1162, 1168 (10th Cir. 2011) (en banc) (internal quotations and alterations omitted).

To establish standing under Article III, the plaintiff "must have suffered an injury in fact – an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560 (1992) (citations and internal quotation marks omitted). The plaintiff must also show "a causal connection between the injury and the conduct complained of," and a likelihood that the injury will be "redressed by a favorable decision." *Id.* For prudential standing, a plaintiff must have: (1) a specific grievance as opposed to a general injury shared by a large class of citizens; (2) assert its own rights rather than those of third parties; and (3) have a complaint that falls within the zone of interest defined by the constitutional provision at issue. *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.,* 454 U.S. 464, 474-75 (1982). The plaintiff, as the party asserting jurisdiction, bears the burden of showing that he has standing. *Id.*; *Utah Ass'n of Counties v. Bush*, 455 F.3d 1094, 1100 (10th Cir. 2006).

A.      Jennifer Yarbrough

As set forth above, the Court has found that the Plaintiffs fail to plausibly allege claims for invasion of privacy, both pursuant to the Due Process Clause of the Fourteenth Amendment and to state law. Therefore, although Ms. Yarbrough may have properly alleged an invasion of her own privacy, the issue is moot if the recommendation is adopted by the District Court.[9] In accordance with this Court's findings herein that the Plaintiffs have failed to plausibly allege claims for invasion

---

[9]The same is true for Jason Gallegos, to the extent he seeks redress for any invasion of privacy by Defendants. *See* discussion concerning privacy claims, *supra*.

of privacy, the Court respectfully recommends that the District Court dismiss Ms. Yarbrough as a

plaintiff seeking redress for her own injuries.

      B.    <u>Jason Gallegos</u>

     Concerning Jason Gallegos' personal claims, the Plaintiffs allege as follows:

> In early 2012, Jason Gallegos was detained near his house for driving while intoxicated,
> when he had not been drinking; the case is pending in criminal court. The Gallegos
> family house is near the Ft. Lupton Police Department, and the family has been
> subjected to extra scrutiny and contact by the police since the incident concerning
> Cyrus, in violation of their fourth and fifth amendment rights under the U.S.
> Constitution, 42 U.S.C. § 1983, willfully and wantonly under color of state law.

Second Amended Complaint, ¶ 65, docket #15.  Defendants contend that Plaintiffs fail to allege the

personal participation of the named individual police officers and the requirements necessary to

support a *Monell* claim against the named municipalities.  Without any legal support, Plaintiffs

counter that they "should be allowed to determine during discovery which police officers were

involved in the arrest of Jason Gallegos and whether his arrest constitutes a continuing custom and

policy of the Ft. Lupton Police Department."  Response, docket #23 at 31.

     First, although not argued by the parties, the Court concludes that it lacks subject matter

jurisdiction over any claims for injunctive relief Mr. Gallegos might assert in this matter.  "Federal

courts 'have an independent obligation to determine whether subject-matter jurisdiction exists, even

in the absence of a challenge from any party,' and thus a court may *sua sponte* raise the question of

whether there is subject matter jurisdiction 'at any stage in the litigation.'"  *Image Software, Inc. v.*

*Reynolds & Reynolds Co.*, 459 F.3d 1044, 1048 (10th Cir. 2006) (quoting *Arbaugh v. Y & H Corp.,*

546 U.S. 500, 506, 514 (2006)); *see also Harris v. Ill.-Cal. Express, Inc.*, 687 F.2d 1361, 1366 (10th

Cir. 1982) ("Any federal court must, *sua sponte,* satisfy itself of its power to adjudicate in every case

and at every stage of the proceeding, and the court is not bound by the acts or pleadings of the

parties." (citations omitted)).

Here, the allegations reveal that Mr. Gallegos' criminal case remains pending before a state court. Although Mr. Gallegos does not explicitly seek expungement of the charges against him in this case, he alleges that his arrest and detention violate his constitutional rights and asks the Court for "any further relief which the Court deems appropriate." Second Amended Complaint, docket #15 at 10.

Federal courts are to avoid interference with ongoing state proceedings if the state court provides an adequate forum to present any federal constitutional challenges. *Younger v. Harris*, 401 U.S. 37 (1971). *Younger* abstention is jurisdictional. *See Steel Co. v. Citizens for a Better Env.*, 523 U.S. 83, 100 n. 3 (1998) (distinguishing case cited by dissent in support of hypothetical jurisdiction as decided on "*Younger* abstention, which we have treated as jurisdictional"). Courts address it at the outset because a determination that the district court lacks jurisdiction over a claim moots any other challenge to the claim, including a different jurisdictional challenge. Indeed, a Court has no power to decide an issue if it lacks jurisdiction. *See id.* at 93,102. Courts may address jurisdictional issues in any order they find convenient. *D.L. v. Unified Sch. Dist. No. 497*, 392 F.3d 1223, 1229 (10th Cir. 2004).

Pursuant to the *Younger* abstention doctrine, "[e]ven when a federal court would otherwise have jurisdiction to hear a claim, the court may be obliged to abstain when a federal court judgment on the claim would interfere with an ongoing state proceeding implicating important state interests." *Unified Sch. Dist. No. 497*, 392 F.3d at 1227-28. If a party is seeking equitable relief, the Court may dismiss the suit under abstention principles "because of 'scrupulous regard for the rightful independence of the state governments' and for the smooth working of the federal judiciary."

44

*Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 718, 721 (1996) (quoting *Railroad Com. of Texas v. Pullman Co.*, 312 U.S. 496, 501 (1941) (citation omitted)).  Thus, an analysis of abstention principles is warranted here.

> This Court must abstain from exercising jurisdiction if the following conditions are met:
>
> (1) there is an ongoing state criminal, civil, or administrative proceeding, (2) the state court provides an adequate forum to hear the claims raised in the federal complaint, and (3) the state proceedings involve important state interests, matters which traditionally look to state law for their resolution or implicate separately articulated state policies.

*Weitzel v. Div. of Occupational & Prof'l Licensing*, 240 F.3d 871, 875 (10th Cir. 2001).

The *Weitzel* conditions are met in this case.  First, the allegations reveal an ongoing state criminal proceeding from the same arrest and detention.  Second, the state court provides an adequate forum for Plaintiffs' claims, because state courts have concurrent jurisdiction over constitutional claims.  Finally, the state proceedings involve important state interests in that criminal matters such as that involved here are commonly heard in state courts.  Consequently, the Court recommends that the District Court dismiss Jason Gallegos' claims for injunctive relief for lack of subject matter jurisdiction pursuant to the *Younger* abstention doctrine.

With respect to Mr. Gallegos' claims for monetary relief, the Court finds that Mr. Gallegos fails to state plausible claims.  First, the Plaintiffs do not allege in the Second Amended Complaint that Mr. Gallegos' arrest and detention constitutes a custom or policy of the police department or the City of Ft. Lupton.  Even if they did, the Court finds that the allegations do not demonstrate the exercise of an *existing* custom or practice.  *See Tuttle*, 471 U.S. at 823 ("Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which

policy can be attributed to a municipal policymaker.").  To the extent that the Plaintiffs seek to compare Cyrus' detention with Mr. Gallegos' detention for purposes of demonstrating a continuing policy, the Court finds that the allegations do not establish any similarity between the two detentions (except for the minor fact that the detentions may have been conducted by officers of the same police department).  Therefore, the Court recommends **granting** the Police Defendants' motion to dismiss claims by Jason Gallegos against the municipalities.

Plaintiffs appear to claim that Mr. Gallegos' detention was a result of increased scrutiny and contact by the police since the incident concerning Cyrus, rather than a result of his drinking, since the allegations reflect Mr. Gallegos denies that he had been drinking at the time.  As set forth above, the Fourth Amendment requires probable cause for the police to seize a citizen against his will.  *See Pacheco*, 770 F. Supp. 2d at 1183.  Plaintiffs provide no case law in support of their position that increased scrutiny by police violates the Fourth Amendment.  However, even if Mr. Gallegos states a plausible Fourth Amendment violation, he fails to state the personal participation of the named individual Defendants.  Mr. Gallegos concedes as much and asserts that he should be allowed to learn the names of the police officers through discovery in this action.  However, the Plaintiffs have named no John or Jane Doe Defendants in this action of whom they seek to learn identities.

Although the Plaintiffs allege Mr. Gallegos' detention violates the "Fifth Amendment" as well, the Court perceives no possible due process claim and will not fashion one for Mr. Gallegos in this matter.

As the Court lacks subject matter jurisdiction over any claims for injunctive relief and as Mr. Gallegos has failed to state plausible Fourth and Fifth Amendment violations, the Court recommends that the District Court **grant** the Police Defendants' motion to dismiss any Fourth, Fifth or

46

Fourteenth Amendment claims brought by Mr. Gallegos concerning his 2012 arrest and detention.

**CONCLUSION**

Therefore, this Court recommends finding that Plaintiff Cyrus Gallegos, by his next friends, Jason Gallegos and Jennifer Yarbrough, has stated plausible claims for violations of his Fourth and Fourteenth Amendment rights.  However, the Plaintiffs also have failed to state certain claims against the School and Police Defendants.  Accordingly, the Court respectfully RECOMMENDS that the School  District Defendants' Rule 12(b)(6) Motion to Dismiss [filed July 27, 2012; docket #16] and the Ft. Lupton ("Police") Defendants' Motion to Dismiss Plaintiff's Second Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(6) [filed July 30, 2012; docket #17] be **GRANTED IN PART AND DENIED IN PART** as follows:

1.  Grant the School Defendants' motion to dismiss Plaintiffs' due process claims concerning the expulsion hearing and dismiss the individual school board members, Defendants Howard, McWilliams, Long, Perez, McDermott, McCrumb, and Gillespie, from this action;

2.  Deny the School Defendants' motion to dismiss the Plaintiffs' Fourth Amendment claims against the remaining individual Defendants;

3.  Deny the Police Defendants' motion to dismiss the Plaintiffs' Fourth Amendment claims against the individual police officers;

4.  Deny the School Defendants' motion to dismiss Plaintiffs' procedural due process claims against the remaining individual Defendants concerning the allegations that Defendants failed to inform Plaintiffs of the underlying charge(s) for the suspension and failed to provide him an informal hearing before removal from school;

5. Grant the School Defendants' motion to dismiss Plaintiffs' procedural due process claim against the individual Defendants concerning the allegation that Defendants' notification of the suspension was not in writing;

6. Grant the Police Defendants' motion to dismiss Plaintiffs' procedural due process claims against the individual police officers;

7. Grant the School Defendants' motion to dismiss Plaintiffs' privacy claims under the Due Process Clause against the individual Defendants;

8. Grant the Police Defendants' motion to dismiss Plaintiffs' privacy claims under the Due Process Clause against the individual police officers;

9. Grant both motions to dismiss Plaintiffs' claims against the municipalities pursuant to *Monell*, and dismiss Defendants Ft. Lupton Police Department, City of Ft. Lupton, and Weld County School District RE-8 from this action;

10. Grant the School Defendants' motion to dismiss any emotional distress claims concerning the expulsion hearing;

11. Grant the Police Defendants' motion to dismiss any emotional distress claims concerning the arrest and detention of Jason Gallegos;

12. Deny both motions to dismiss Plaintiffs' emotional distress claims concerning the detention, questioning, transportation to the police station and suspension of Cyrus by the individual Defendants;

13. Grant both motions to dismiss Plaintiffs' state law invasion of privacy claims;

14. Dismiss Jennifer Yarbrough as a plaintiff seeking redress for her own injuries; and

15. Grant the Police Defendants' motion to dismiss any Fourth, Fifth or Fourteenth

Amendment claims brought by Jason Gallegos concerning his 2012 arrest and detention, and dismiss Mr. Gallegos as a plaintiff seeking redress for his own injuries in this case.

Dated at Denver, Colorado, this 1st day of October, 2012.

BY THE COURT:

*Michael E. Hegarty*

Michael E. Hegarty
United States Magistrate Judge